# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

DOROTHY R. WOOLFORD                                                                    PLAINTIFF

v.                                     No. 4:06CV00336 JLH

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY ADMINISTRATION                                                          DEFENDANT

## **OPINION**

Dorothy Woolford challenges the final decision of the Commissioner of the Social Security Administration denying her claim for supplemental security income disability benefits. She seeks benefits for the closed period of June 15, 1993, to March 31, 2002.[1] For the following reasons, the decision of the ALJ is affirmed.

The Social Security regulations provide a five-step process to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987). The first step is to determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b); 416.920(a)(4)(i). If not, the second step is to determine whether the claimant has a severe impairment or combination of impairments. *Id.* §§ 404.1520(c), 416.920(a)(4)(ii). The third step is to determine whether the impairments meet or equal a listed impairment that is presumed to be disabling. *Id.* §§ 404.1520(d), 416.920(a)(4)(iii). If so, benefits are awarded. If not, the evaluation proceeds to step four, which involves a determination of whether the claimant has sufficient residual functional capacity to perform her past work. *Id.* §§ 404.1520(e)-(f), 416.920(a)(4)(iv). If the claimant is unable to do so,

---

[1]The application at issue here was filed in 1994. A subsequent application resulted in Woolford being found disabled due to asthma with an onset date of March 1, 2002.

the question at step five is whether the claimant is able to perform other substantial and gainful work within the economy, given the claimant's age, education, and work experience. *Id.* §§ 404.1520(g), 416.920(a)(4)(v).

**I.**

Woolford is a fifty-one-year-old female with a high-school education and previous work experience as an electronics worker, food service and production worker, and retail salesperson. In April of 1993, Woolford ceased working and has not worked since. At issue here is Woolford's application for supplemental security income benefits filed November 7, 1994.[2] The specific question at issue here is whether the ALJ correctly determined Woolford's mental residual functional capacity. The district court[3] reversed the ALJ's 2000 decision to deny Woolford benefits and remanded the case back to the ALJ solely to reassess Woolford's mental residual functional capacity. The following is a summary of the evidence in the record concerning Woolford's mental impairments.

On September 6, 1990, Woolford was hospitalized for dysthymia and cocaine and alcohol abuse at the Eastern Shore Hospital Center in Maryland. Woolford had previously been twice hospitalized at the Willis Hudson Center for drug rehabilitation. After her discharge from the Eastern Shore Hospital Center, Woolford was admitted to the A.F. Whitsitt Alcoholism Rehabilitation Center on September 28, 1990. Woolford was depressed and suicidal at the time she

---

[2]Woolford also claims she is entitled to disability insurance benefits even though she did not include such a claim on her 1994 application. Because the Court finds that the ALJ's decision was supported by substantial evidence, the Court does not reach the question of whether Woolford may be deemed to have constructively applied for disability insurance benefits.

[3]The Honorable James M. Moody, District Judge.

was admitted. Woolford completed the program at the center and was released on October 26, 1990. The counseling summary notes stated that Woolford "was compliant, completed her assignments, showed understanding of the material, and actively participated in groups." At the time of her discharge, Woolford's prognosis was listed as "good."

Dr. Efigenio Bautista, who began treating Woolford in March 1990, completed a mental status and summary of treatment form dated April 18, 1991. On that form, Bautista checked the box "well-groomed" under the title "Dress [and] Grooming." Bautista also checked the box "mild" for "Level of Anxiety," "unremarkable" for "Mood," "appropriate" for "Affect," "good" for "Impulse Control," "good" for "Judgment," and "cooperative" for "Interview Behavior." A non-treating, non-examining physician for the Maryland Disability Determination Services performed a psychiatric review of Woolford's medical history. On a form dated April 30, 1991, the reviewing physician noted that while Woolford had diagnoses of "dysthymia, generalized anxiety disorder and past history of substance abuse," the mental status exam completed by Bautista was "within normal limits." The physician checked the box "RFC Assessment Necessary (i.e. a severe impairment is present which does not meet or equal a listed impairment)." The physician checked "slight" for the functional limitations "restriction of activities of daily living," "difficulties in maintaining social functioning," and "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner" and "insufficient evidence" for the functional limitation "episodes of deterioration or decompensation in work or work-like settings."

The same reviewing physician filled out a mental residual functional capacity assessment dated April 30, 1991. The physician checked the box "moderately limited" for the categories "ability to understand and remember detailed instructions," "ability to carry out detailed instructions,"

3

"ability to maintain attention and concentration for extended periods, "ability to work in coordination with or proximity to others without being distracted by them," and "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms." For all the other categories, the reviewing physician checked the box "not significantly limited."

Another psychiatric review form dated July 30, 1991, was completed by a non-treating, non-examining DDS physician. That physician checked the box "Impairment(s), not severe." The physician checked the box "slight" for the functional limitations "restriction of activities of daily living" and "difficulties in maintaining social functioning"; "seldom" for the functional limitation "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner"; and "insufficient evidence" for the functional limitation "episodes of deterioration or decompensation in work or work-like settings."

Bautista completed a second mental status report for Woolford dated January 5, 1995. On that form, Bautista listed dysthymic disorder and cannabis abuse as Woolford's clinical disorders. He noted that Woolford was well-groomed and had a mild level of anxiety, a depressed mood, blunted affect, good impulse control, and good judgment. Bautista also noted no suicidal behavior and that Woolford exhibited cooperative interview behavior.

A DDS medical consultant completed a psychiatric review technique dated January 18, 1995. The consultant checked the boxes for slight limitation in performing the activities of daily living, moderate limitation in maintaining social functioning, "insufficient evidence" for the functional limitation "episodes of deterioration or decompensation in work or work-like settings,." and "often" for failure to complete tasks in a timely manner due to deficiencies of concentration, persistence, or pace. The same consultant completed a mental residual functional capacity assessment dated January

4

18, 1995. The consultant wrote that Woolford "appear[ed] capable of simple, routine, low-stress work." The consultant found Woolford only to be moderately limited in her ability to interact socially and maintain sustained concentration and persistence.

Woolford was admitted to the Eastern Shore Hospital Center on January 26, 1995, for increasing symptoms of depression, suicidal thoughts, crying spells, and generalized dysphoria associated with overeating and lack of sleep. Woolford was diagnosed with bipolar 1 disorder, dissociative disorder, and cannabis dependence. The hospital psychiatrist Dr. Lopez performed a psychiatric assessment the day after Woolford's admission and determined that Woolford had a global assessment of functioning of 60.[4] At the time of her discharge on February 23, 1995, her global assessment of functioning was 80[5] and her prognosis was fair.

A DDS consultant completed a mental residual functional capacity assessment dated April 20, 1995. The consultant checked "moderately limited" for the categories "ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances"; "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms"; and "ability to accept instructions and respond appropriately to criticism from supervisors." The consultant checked "no evidence of limitation" for the categories "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes"; "ability to carry out detailed instructions" and "ability to understand and remember detailed instructions." For all the other categories, the consultant checked "not significantly limited."

---

[4] A global assessment of functioning withing the range of 51-60 means "moderate difficulty in social, occupational, or school functioning."

[5] A global assessment of functioning range of 71-80 means "no more than slight impairment in social, occupational, or school functioning."

The consultant opined that Woolford "appear[ed] capable of simple, repetitive work at least."

On November 13, 1996, Woolford was hospitalized at the Doctor's Hospital in Little Rock for observation due to severe depression along with crack cocaine abuse, inability to function, inability to sleep, anxiety and a death wish. Her global assessment of functioning at the time of admission was 20. She was diagnosed with major depressive disorder, recurrent, with death wish as well as severe anxiety disorder, generalized anxiety disorder, cocaine abuse and dependence, and cannabis abuse. Woolford was discharged on November 19. At discharge, her global assessment of functioning was 80 and her prognosis was very good. Woolford was readmitted to the hospital on December 4 after drinking, getting into an argument with her family, and overdosing on her medicine. Woolford denied any suicidal or homicidal ideation when she was interviewed on December 5. Woolford was discharged that day. Her global assessment of functioning at the time of discharge was about 85.

Woolford was referred to Anne Stanfield-Hagert, a licensed clinical social worker, on March 24, 1997. Stanfield-Hagert saw Woolford on five occasions. In her treatment summary, Stanfield-Hagert wrote that Woolford had "learned how to function responsibility and almost independently" as well as "to problem solve, express her feelings appropriately, and test reality." Stanfield-Hagert wrote that while Woolford was "currently struggling with chronic depression that is in remission," Woolford was "not suicidal or homicidal" and was "proud of her ability to raise her grandchildren." Stanfield-Hagert listed Woolford's social restrictions as needing "to avoid situations where she would be scapegoated or would otherwise jeopardize her current level of functioning."

Around June 1998, Woolford began mental health treatment at Professional Counseling Associates in Little Rock. John Downes, the psychiatrist at Professional Counseling Associates,

6

performed a psychiatric evaluation dated June 24, 1998. In that evaluation, Downes listed "Major Depressive Disorder, Recurrent, Severe without psychotic features" as Woolford's clinical disorder. Downes also diagnosed Woolford with borderline personality disorder. For her global assessment of functioning, Downes wrote, "Highest level in the past year is 55. Current level is 38."

The record contains the treatment notes of Woolford's treating psychiatrists, counselors, social workers, and mental health para-professionals at Professional Counseling Associates from June 1998 to November 2001. They document Woolford's life on an almost daily basis. They reveal that Woolford did well on her medications; maintained good hygiene and appearance; kept her home clean; shopped for groceries; took care of two of her grandchildren who were in her custody, as well as her teenage daughter; traveled to Maryland several times and Texas once; demonstrated a good ability to socialize and interact with her peers, playing spades with them on several occasions; possessed excellent communication skills and responded well to others; actively participated in group therapy sessions; moved and wiped tables, washed windows, and assisted others in preparation for a luncheon; participated in aerobics classes; worked "very hard" wiping tables and windows in the environmental services unit at Professional Counseling Services, doing a "good job completing her assigned tasks"; worked answering phones at the front desk in the clerical unit at Professional Counseling Services where she was "very responsible and timely with her tasks; worked cleaning and reorganizing the library of Professional Counseling Services where she was "very diligent in her work activities"; cooperated with staff at Professional Counseling Services and was "very responsible and timely with her tasks"; volunteered as a model in a fashion show and at Advocates for Kids, a nonprofit organization that assists grandparents who are raising their children; and even attempted to get a part-time job. The rare notations in the treatment histories that Woolford was

7

anxious, under stress, or depressed were usually accompanied by remarks that Woolford was able to cope with her anxiety and stress well with the help of her medication. The treatment notes do not contain any instance of Woolford suffering suicidal or homicidal ideation as a result of her psychological impairments. The notes record that Woolford denied on several occasions having any suicidal or homicidal thoughts despite experiencing anxiety or depression.

Downes and Robin Mullings, a licensed professional counselor at Professional Counseling Associates, completed a four-page psychiatric/psychological questionnaire dated December 6, 1999. At the time they completed the questionnaire, Downes had been treating Woolford for a year and a half at two-month intervals, while Mullings had been seeing Woolford for fourteen months at two-week intervals. They listed borderline personality disorder as Woolford's primary diagnosis and major depressive disorder, recurrent, severe as an "other diagnosis." When asked to describe Woolford's clinical signs, they wrote:

> Dorothy's depression is stabilized at this time. She has symptoms of increased sleep, isolation, increased appetite, and agitation when going through a depressive episode. Agitation may lead to fighting. When severely depressed, she gets suicidal. Dorothy also has anxiety in which she becomes overwhelmed very easily and results may be that she gets homicidal and/or suicidal. She has chaotic relationships with men as well as family members.

As a response to the question "[d]oes Claimant have a medically disabling condition that has lasted or is expected to last at least 12 months," Mullings and Downes wrote, "Yes. Her mental illness is chronic." As a response to the question "[d]o you feel claimant can work at a full-time job at the present time," they wrote, "No."

The last piece of evidence in the record dealing with Woolford's mental impairments is the December 10, 2001, mental assessment by Steve Hacker, a licensed social worker at Professional Counseling Associates. Hacker rated Woolford's ability to relate to co-workers and deal with the

8

public as "poor to none."[6] For the clinical findings supporting those ratings, Hacker wrote, "Client's primary diagnosis of borderline personality [disorder] reflects client[']s ability to maintain stable [and] working relationships [with] others. Client has demonstrated in the past poor impulse control as well in her interactions [with] family members/peers. See progress notes [with] primary therapists[.]" Hacker also rated as "poor to none" Woolford's ability to behave in an emotionally stable manner, her ability to relate predictably in social situations, and her ability to demonstrate reliability. For the clinical findings to support those ratings, Hacker wrote, "[C]lient[']s ability to present . . . good hygiene may be diminished due to major depressive [episodes] which are ongoing. Client[']s reliability may be diminished due to demands of raising 3 children."

## II.

In this judicial review, the Court must determine whether the ALJ's decision is supported by substantial evidence in the administrative record. 42 U.S.C. § 405(g). If supported by substantial evidence, the ALJ's findings are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422, 28 L. Ed. 2d 842 (1971); *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson*, 402 U. S. at 401, 91 S. Ct. at 1427; *Reynolds*, 82 F.3d at 257. In assessing the substantiality of the evidence, the Court must consider evidence that detracts from the ALJ's decision as well as evidence that supports it; the Court may not, however, reverse merely because substantial evidence would have supported an opposite decision. *Woolf v. Shalala*, 3 F.3d 1210,

---

[6]The assessment form described "poor to none" as "no useful ability to function in this area."

9

1213 (8th Cir. 1993).

The only issue here is whether the ALJ's conclusion that Woolford's mental residual functional capacity does not prevent her from obtaining substantial and gainful employment is supported by substantial evidence. While both parties have briefed whether the ALJ erred in concluding that Woolford did not meet any of the listings in step three of the sequential evaluation, that issue was previously determined in the magistrate's August 27, 2003, proposed findings and recommended disposition adopted by District Judge Moody on September 15, 2003. Reconsidering that issue implicates the law of the case doctrine. Law of the case rules have developed to maintain consistency and to avoid reconsideration of matters once decided during the course of a single lawsuit. *Erie Conduit Corp. v. Metropolitan Asphalt Paving*, 560 F. Supp. 305, 307 (E.D.N.I. 1983). Those rules reflect the respect that one judge or court owes the rulings of another judge or court in the same or closely-related cases. *Id*. Decisions once made are generally followed unless controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice. *White v. Murtha*, 377 F.2d 428 (5th Cir. 1967). *See also United States v. Bartsch*, 69 F.3d 864, 866 (8th Cir. 1995). Neither of those two exceptions apply here. Accordingly, the law of the case doctrine prevents this Court from reexamining the already-decided issue of whether Woolford's medical impairments met any of the listings.

It is the claimant's burden, and not the Commissioner's burden, to prove the claimant's residual functional capacity. *Masterson v. Barnhart*, 383 F.3d 731, 737 (8th Cir. 2004). Woolford argues that the ALJ's decision finding that Woolford's mental residual functional capacity did not preclude her from obtaining substantial and gainful employment is not supported by any medical

evidence. Woolford argues that the ALJ improperly relied on the DDS assessments because the ALJ specifically stated that they were entitled to "little weight" in his previous opinion due to the fact that they were completed "without benefit of testimony and current medical documentation." Since residual functional capacity is a medical question, an ALJ's finding must be supported by some medical evidence. *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005). After expressly discrediting the DDS assessments in his previous opinion because they were completed before the record was more developed, the ALJ would had erred had those assessments been the only medical evidence supporting his decision. However, the ALJ's decision was supported by ample medical evidence besides the dated DDS assessments. The ALJ closely examined the treatment notes from Woolford's treating psychiatrists, as well as the notes from counselors, social workers, and mental health para-professionals before determining that Woolford possessed the mental residual functional capacity to perform a wide range of sedentary work. *Cf. Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (holding that treatment histories were sufficient medical evidence to support an ALJ's decision).

The treatment notes support the ALJ's decision. They document Woolford's life on an almost daily basis. They reveal that Woolford did well on her medications; maintained good hygiene and appearance; kept her home clean; shopped for groceries; took care of two of her grandchildren who were in her custody, as well as her teenage daughter; traveled to Maryland several times and Texas once; demonstrated a good ability to socialize and interact with her peers, playing spades with them on several occasions; possessed excellent communication skills and responded well to others; actively participated in group therapy sessions; moved and wiped tables, washed windows, and assisted others in preparation for a luncheon; participated in aerobics classes; worked "very hard"

11

wiping tables and windows in the environmental services unit, doing a "good job completing her assigned tasks"; worked answering phones at the front desk in the clerical unit where she was "very responsible and timely with her tasks"; worked cleaning and reorganizing in the library where she was "very diligent in her work activities"; cooperated with staff at Professional Counseling Services and was "very responsible and timely with her tasks"; volunteered as a model in a fashion show and at Advocates for Kids; and even attempted to get a part-time job. Notations in the treatment histories that Woolford was under stress or depressed were usually accompanied by remarks that Woolford was able to cope with her anxiety and stress well with the help of her medication. The treatment notes do not contain any instance of Woolford suffering suicidal or homicidal ideation as a result of her psychological impairment. Indeed, the notes record that Woolford denied on several occasions having any suicidal or homicidal thoughts despite experiencing anxiety or depression.

Woolford makes several arguments to counter the above evidence, none of which is persuasive. First, she cites the Eighth Circuit's opinion in *Hutsell v. Massanari* for the proposition that a claimant "need not be bedridden to qualify for disability benefits." 259 F.3d 707, 713 (8th Cir. 2001). In *Hutsell*, the medical evidence "uniformly indicate[d] that the stress of any sustained work [was] more than [the plaintiff could] handle." *Id.* In this case, however, Woolford was able to handle the stress of raising two children—and, at some periods during her treatment, three—without any serious depressive or suicidal episodes documented in the years of treatment notes. Moreover, the treatment notes contain nothing but praise for Woolford's ability to complete work-related tasks and her ability to take care of herself and her home on a daily basis, while the praise for Woolford's

ability to interact with her peers is nearly as complete.[7] While the claimant need not be bedridden, the medical evidence must at least be consistent with the claimant's claimed level of limitation. *See id*. Here the ALJ reasonably concluded that it was not.

Woolford also argues that the ALJ failed to accord proper weight to the opinions of Mullings and Downes contained on the questionnaire dated December 6, 1999, and Hacker's December 10, 2001, assessment of Woolford's mental residual functional capacity. Although Mullings and Downes treated Woolford for over a year before filling out the questionnaire, the ALJ was not required to give controlling weight to their conclusory opinion that Woolford's mental illness precluded full-time employment. *Cf. Browning v. Sullivan*, 958 F.2d 817, 823 (8th Cir. 1992) ("Dr. Hunt's conclusory letter diagnosing Browning as disabled did not contain supporting medical evidence and therefore did not begin to overcome the substantial medical evidence supporting the ALJ's decision."); *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991). While not entitled to controlling weight, the opinion of Mullings and Downes still merited consideration. *See* 20 C.F.R. § 404.1527(d)(2); *see also Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). The ALJ discredited the questionnaire because it was inconsistent with the "wide range of daily activities [Woolford] performs, including the care and custody of two grandchildren, and her teenage daughter." After examining the questionnaire in light of the medical evidence in the record as a whole, the Court cannot say that the ALJ erred when he chose not to rely upon the opinion of Mullings and Downes. *See* 20 C.F.R. § 404.1527(d)(4) (consistency with the evidence in the record as a whole a factor in determining the weight to give an opinion).

---

[7]On a few instances Woolford was chided for dominating the conversation in her therapy group; one verbal altercation between Woolford and a peer is also mentioned in the notes.

Furthermore, an examination of the questionnaire itself casts doubt on its reliability. Mullings and Downes offer opinions outside their area of treatment and expertise when they state that Woolford "has asthma and hypertension which are disabling for her." They also state that Woolford's "[p]sychiatric problems go back to 1985" despite not having seen or treated Woolford before 1998. In addition, some of the statements in the questionnaire are incongruous with Mullings's and Downes's own treatment notes. In describing Woolford's "clinical signs," Mullings and Downes wrote, "When severely depressed, she gets suicidal. Dorothy also has anxiety in which she becomes overwhelmed very easily and results may be that she gets homicidal and/or suicidal." However, Mullings and Downes recorded no instances of Woolford experiencing homicidal or suicidal ideation in the over three years of their treatment notes contained in the record. On the contrary, the treatment notes contain several occasions where either Mullings or Downes noted that Woolford was not having any suicidal or homicidal thoughts despite reporting that she experienced anxiety or depression. The last time Woolford experienced suicidal thoughts according to the evidence in the record was in November 1996, more than a year before either Mullings or Downes began treating Woolford.

The ALJ also did not err in discrediting Hacker's December 10, 2001, assessment. The opinion of a social worker like Hacker is not entitled to the weight of a "medical opinion" or a "treating source" under the regulations. *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006). While the assessment still demanded consideration as other medical evidence, *see id*., an examination of the assessment confirms that the ALJ did not err in refusing to rely upon it. Many of the findings and statements on the assessment are completely unsupported by any clinical evidence. For example, Hacker wrote "client[']s ability to present . . . good hygiene may be

14

diminished due to major depressive [symptoms] which are ongoing" as one of the "medical/clinical findings" to support his assessment of Woolford. While the treatment notes consistently complemented Woolford on her good hygiene, nowhere in the over three years of treatment notes was it ever noted that Woolford had poor hygiene. Hacker also checked "poor to none" to describe Woolford's ability to relate to co-workers and wrote "see progress notes w/ primary therapists" to explain that rating. The progress notes, however, only contain praise for Woolford's ability to interact with her peers. Other statements on the assessment are similarly unfounded.

Although this is a close case, the Court must affirm the ALJ's decision if it is supported by substantial evidence. The Court finds that it is. In light of the evidence in the record, the ALJ did not err in finding that the medical evidence of Woolford's mental impairments, taken as a whole, did not support her claimed level of limitation.

## CONCLUSION

The ALJ's determination that Woolford can perform other substantial and gainful work within the economy is supported by substantial evidence on the record as a whole. The ALJ's decision is AFFIRMED and Woolford's complaint is DISMISSED with prejudice.

IT IS SO ORDERED this 21st day of March, 2007.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE